IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 27, 2015

**STATE OF TENNESSEE v. DONDRINKUS T. DICKERSON**

**Appeal from the Circuit Court for Robertson County**
**No. 74CC3-2014-CR-403     William R. Goodman, III, Judge**

---

**No. M2015-00012-CCA-R3-CD – Filed January 26, 2016**

---

A Robertson County jury convicted the Defendant, Dondrinkus T. Dickerson, of rape, and the trial court sentenced the Defendant to ten years in the Tennessee Department of Correction to be served consecutively to his prior sentences. On appeal, the Defendant contends that: (1) the evidence is insufficient to support his conviction; and (2) the trial court abused its discretion when it sentenced him. After a thorough review of the record and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

Roger E. Nell, District Public Defender, and Collier W. Goodlett, Assistant District Public Defender, Springfield, Tennessee, for the appellant, Dondrinkus T. Dickerson.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; John W. Carney, District Attorney General; and Jason C. White, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's alleged rape of the victim, K.J.[1] A Robertson County grand jury indicted the Defendant for the rape of K.J. by force or coercion.

---

1 It is the policy of this court to refer to victims of sexual offenses by their initials.

## A. Trial

The parties presented the following evidence at trial: The victim, K.J., testified that she was nineteen-years-old at the time of trial. She testified that she was eighteen-years-old on March 28, 2014, the date of the rape. Prior to that date, she was friends with the Defendant and had had a brief sexual relationship with him lasting a couple of months. She stated that they had "broken up" two weeks before the March 28 incident. The reason for the breakup was that the Defendant wanted K.J. to have anal sex with him and K.J. refused.

K.J. was living with her aunt and her father on March 28, 2014, and she stated that neither relative liked the Defendant. That morning, K.J. was at the residence alone and went outside to check the mailbox sometime before noon. She saw the Defendant outside and quickly turned and walked "fast" back to the front door. K.J. locked the screen door, but the Defendant "jerked" it open and came inside. K.J. and the Defendant sat down in the living room and started having a conversation. She said that she did not want him inside the house but that she did not call the police because she did not believe the Defendant would harm her.

In the living room of the house, K.J. sat in a chair and the Defendant sat on the sofa, and they continued their conversation for five minutes. Then, K.J. "got up and [walked] towards [her] bedroom," and the Defendant followed her. The Defendant was pushing her into her bedroom, and she grabbed the wall in an attempt to stop him, telling him "no." The Defendant pushed her into her bedroom, and she fell on her back onto her bed. The Defendant started "telling [the victim] to pull [her] pants off and [she] wouldn't pull them off." The victim recalled that she was wearing sweatpants and that she held them up by the waistband while he attempted to pull them off of her. The victim stated that the Defendant used enough force to pull down her pants so that she could no longer hold them up. Next, the Defendant forced the victim "to do something that [she] didn't want to do." She explained that the Defendant forced her to turn over onto her stomach and, when she tried to get up, the Defendant prevented her from doing so by placing his hands on her back and holding her down with force. The victim heard the Defendant unzip his pants, and then he attempted to penetrate her anally with his penis. The victim told him to stop and the Defendant "kept saying no." The victim stated that the Defendant succeeded in penetrating her anus two or three times. She continued to tell him "no" and threatened to call her mom. The Defendant replied, "F your mom," and then the victim told him she was going to call the police.

The victim testified that the Defendant also penetrated her vaginally two times. She reiterated that during the time he was penetrating her both vaginally and anally he kept his hand on her back, preventing her from getting up. She stated that she did not consent to these sexual acts. The victim stated that the Defendant ejaculated inside her anus and then walked out the door and left her house. The victim immediately called her mom, who told her to call

the police, so the victim called the police. She stated that the police responded immediately.

After the police arrived at her house, the victim went to NorthCrest Medical Center where a rape kit test was performed. The victim stated that her examiner took swabs from her vagina, anus, and mouth. After the examination, the victim spoke with Detective Elizabeth Leonard. Detective Leonard instructed the victim to text the Defendant, and then the detective took pictures of the text messages exchanged between the victim and the Defendant. The text messages were entered into the record as an exhibit. In the text message, the victim told the Defendant that he had raped her and he responded with a text message denying a rape had occurred.

On cross-examination, the victim agreed that, at the preliminary hearing, she had testified that the Defendant had picked her up off of the couch. The victim agreed that, when the Defendant entered her house, her cell phone was close by but said that she did not call her mom or the police. She agreed that no weapon was involved in their encounter. The victim clarified that, when she was lying down on her back on the bed the Defendant told her to stand up, which she did willingly. He then turned her around and "using a little force," forced her back down on the bed onto her stomach.

On redirect-examination, the victim testified that the Defendant used "a lot" of force when he pushed her into her bedroom. She also stated that he used "a lot" of force when he held her down on the bed, preventing her from getting up.

Detective Elizabeth Leonard testified that she worked at the Springfield Police Department in the child abuse and sex crimes department. She stated that she responded to the victim's residence on March 28, 2014, where she made contact with the victim and the victim's mother, Cheryl Cooksy. She stated that the victim was crying and visibly upset. The victim told her that she had been raped vaginally and anally, so Detective Leonard told her to go to NorthCrest Medical Center for a medical exam. The victim's mother drove the victim to NorthCrest, and Detective Leonard met them there.

Detective Leonard gave the doctor assigned to the victim a "sexual assault kit," which she stated was kept at the police department and brought to the hospital to be used in the examination of the victim. After the doctor performed the examination, the doctor sealed the kit and returned it to Detective Leonard.

Detective Leonard testified that, on the day of the incident, after she arrived at the victim's house, the victim's cell phone rang, and the victim indicated that the Defendant was calling her. Detective Leonard told the victim not to answer his call but instead to send him a text message. Later, the detective photographed the text messages exchanged between the

victim and the Defendant. After speaking with the victim, Detective Leonard went to the Defendant's place of employment, Kevin's Restaurant, and arrested the Defendant. She advised the Defendant of his *Miranda* rights after the Defendant had been transported to the police department and the Defendant agreed to speak to Detective Leonard. Initially, he denied having been at the victim's house that day. Later in their conversation, the Defendant admitted to being at the victim's house but stated that he had been only in the yard but not inside the house. He never admitted to going inside the victim's house. The Defendant also denied that he had raped the victim. The Defendant consented to providing a DNA sample, and Detective Leonard took a swab from inside the Defendant's mouth.

On cross-examination, Detective Leonard agreed that she did not attempt to retrieve fingerprints from the victim's house.

On redirect-examination, Detective Leonard explained that no fingerprints were taken from the residence because the victim knew the person who had raped her and there was "no question" about the identity of the offender.

Dr. Lisa Yezbak, an emergency medicine physician, testified as an expert in the field of emergency medicine, including the field of sexual assault examination. Dr. Yazbek testified that she saw the victim in the emergency room at NorthCrest and that the victim stated to her that she had been raped. Dr. Yazbek performed an examination on the victim, during which she observed that the victim had a tear to her anus and a substance that appeared to be semen inside her anus. Dr. Yazbek testified that the tear was likely sustained during sexual intercourse by force. Dr. Yazbek obtained swabs of DNA from the victim's vagina and anus. The sexual assault kit used during the examination was sealed and given to Detective Leonard. A swab from inside of the victim's cheek, as well as a sampling of her pubic hair, was also given to Detective Leonard. Dr. Yazbek recalled that the victim cried during the examination.

On cross-examination, Dr. Yazbek agreed that hospital records indicated that the victim weighed 230 pounds on the day of examination. Dr. Yazbek agreed that the victim wanted to use her cell phone during the examination.

Dr. Laura Boos testified that she was employed as a scientist in the forensic biology unit at the TBI. She was declared an expert in the field of DNA analysis and examination. Dr. Boos testified that she analyzed the DNA samples taken in this case from the victim and the Defendant. Dr. Boos stated that she found sperm cells in the samples taken from the victim's vagina and anus, and then she processed the DNA in those sperm cells. The DNA in the sperm cells found inside the victim's anus matched the Defendant's DNA.

On cross-examination, Dr. Boos agreed that her analysis could not indicate whether the victim and the Defendant's sexual encounter was consensual.

The Defendant testified that he was twenty-one years old on March 28, 2014, and was five foot tall and weighed 124 pounds. He testified that, on that date, the victim called him on the phone and told him to come to her house, which he did. The Defendant testified that he never went inside the house. The Defendant testified that he spoke to the victim in the yard of the house. There, the victim ran towards him and hugged him. The Defendant testified that, on a door stoop on the side of the house, the victim pulled his pants down and put her hand on his penis. The Defendant "froze," the victim continued to "play" with his penis, and he "came real quick all over her hand and there was [some semen] on her hand." The victim then "put her hand underneath herself and was playing with herself." The Defendant pulled his boxer shorts and his pants up and walked away to go to his grandmother's house. From his grandmother's house, he went to work at his uncle's restaurant. The Defendant denied forcing himself upon the victim either vaginally or anally.

On cross-examination, the Defendant testified that he and the victim were friends and had not had a prior romantic relationship. He denied having had sex with the victim in the past. The Defendant stated that he had not spoken to the victim in the months prior to March 28 and that she called him that morning and asked him to come over. The Defendant agreed that he was asked by Detective Leonard whether his sperm was inside the victim and that he told Detective Leonard that his sperm was not inside her. The Defendant stated that his sperm might have been found inside the victim because she put her finger or hand inside of herself.

On rebuttal-examination, Detective Leonard testified that, during the Defendant's interview on the day of his arrest, the Defendant stated that he and the victim had been in a relationship the year prior. Detective Leonard testified that she asked the Defendant if she would find his sperm in or on the victim's body and he said, "no." The State then played for the jury the video recording of Detective Leonard's March 28 interview with the Defendant. In the portion played, the Defendant denied that he had sex with the victim that day. The detective says, "So I'm not going to find your semen in [the victim's] house, . . . not going to be on her body anywhere?" The Defendant indicated that he did not engage in sexual intercourse with the victim. Based on this evidence, the jury convicted the Defendant of rape.

## B. Sentencing

At the sentencing hearing, the trial court admitted into evidence the presentence report

5

and certified copies of the Defendant's prior convictions for attempted aggravated sexual battery and statutory rape. Greg Tinsley testified that he was employed at TDOC as a probation officer tasked with supervising sex offenders. He stated that he was assigned to supervise the Defendant. Mr. Tinsley testified that the Defendant was ordered to be on probation until December 10, 2018, and that on March 28, 2014, the Defendant was on probation for two prior felony convictions.

The Defendant testified that he was twenty-one years old and had a high school "resource diploma." He stated that he did not read or write well in school and was enrolled in special classes. The Defendant testified that he worked at his uncle's restaurant, cleaning dishes, throwing away trash, and cleaning up. He testified that he did not work the cash register at the restaurant because he was not good at counting. The Defendant testified that he was taking medication for bipolar disorder.

At the conclusion of the sentencing hearing, the trial court stated that it understood the Defendant's mental and psychological limitations and that it considered those limitations, weighed against the risk to society. In terms of mitigating and enhancement factors, the trial court stated that it was considering as mitigation that the Defendant and the victim were in a prior consensual sexual relationship. The trial court applied enhancement factor (1), that the Defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; and enhancement factor (13), that the Defendant was released on probation when the current offenses occurred. *See* T.C.A. § 40-35-114(1), (13) (2014). The trial court then sentenced the Defendant to ten years for the rape conviction, to be served at 100%.

Addressing the issue of consecutive sentencing, the trial court stated that it found that sentencing factor (4), that the Defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high; and sentencing factor (6), that the Defendant is sentenced for an offense committed while on probation. T.C.A. § 40-35-115(b)(4), (6) (2014). As to factor (4), the trial court stated that the rape clearly indicated little regard for human life, as there was the potential for injury or harm to the victim. The trial court stated that the Defendant's prior history of sexual assault indicated little regard for the lives of others. Accordingly, the trial ordered that the Defendant's ten-year sentence would be served consecutively to his prior sentences in the Tennessee Department of Correction. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends: (1) the evidence is insufficient to support his

conviction; and (2) the trial court abused its discretion when it sentenced him.

## A. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence to convict him of rape. He contends that this is a "case of he-said she-said" and that the presence of the Defendant's sperm in the victim's anus does not amount to proof that he raped her. He contends that the victim's allegation that he forced her to have anal sex is not supported by the evidence. The State responds that the victim's testimony was sufficient to establish that the Defendant penetrated her anus and that it was for the jury to accredit or discredit her testimony. The State contends that the evidence was sufficient to establish the elements of the offense. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

"The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571

7

S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

As is relevant to this appeal, a conviction for rape requires "unlawful sexual penetration of a victim by the defendant . . . accompanied by any of the following circumstances: (1) Force or coercion is used to accomplish the act[.] T.C.A. § 39-13-503 (a)(1) (2014).

The evidence, considered in the light most favorable to the State, showed that the Defendant was at the victim's house on March 28, 2014. While inside the house, the victim and the Defendant conversed in the living room and then the victim got up to walk to her bedroom. The Defendant followed her and pushed her into her bedroom, causing the victim to fall onto her bed. The Defendant forcibly pulled the victim's sweatpants down despite her repeatedly saying "no." The Defendant then told the victim to stand up and turn around, and then forced her back onto the bed on her stomach. The Defendant unzipped his pants and penetrated the victim anally with his penis several times. He also penetrated her vaginally two times. While penetrating the victim, the Defendant forcibly held her down on the bed using his hands on the center of her back. The Defendant then ejaculated inside the victim's anus. Dr. Boos later identified the sperm found inside the victim's anus as a match to the Defendant's DNA. This evidence is sufficient to support the jury's verdict that the Defendant raped the victim using force. Any questions as to the victim's credibility were resolved by the jury's verdict and will not be second guessed by this Court on appeal. *See Bland*, 958 S.W.2d at 659. The Defendant is not entitled to relief.

## B. Sentencing

The Defendant next contends that the trial court abused its discretion when it sentenced him. He contends that the trial court failed to consider the purposes and principles of sentencing and the other evidence presented. He further argues that the trial court failed to make findings, as required by *State v. Wilkerson*, 905 S.W.2d 933, 937-38 (Tenn. 1995), in declaring him a dangerous offender. While the Defendant acknowledges that the trial court also applied the consecutive sentencing factor that he was on probation when he committed the rape, this, the Defendant contends "does not save the sentence" because the trial court failed to consider the sentencing principles "*in toto.*" The State responds that the trial court's failure to consider the factors set forth in *Wilkerson* "does not render the overall sentencing decision unreasonable because [the trial court] also made an explicit finding that [sentencing factor (6)] applied." The State notes that "the presence of a single factor under Tenn. Code Ann. § 40-35-115 is enough to justify the imposition of a consecutive sentence" and thus, the trial court did not abuse its discretion. We agree with the State.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence and the manner of service of that sentence. In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. 380 S.W.3d 682 (Tenn. 2012). The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).

Thus, the reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

Tennessee Code Annotated section 40-35-115(b) (2014) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. As is relevant in this case, the trial court found the following criteria applicable:

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

. . . .

(6) The defendant is sentenced for an offense committed while on probation;

T.C.A. § 40-35-115(4) and (6). These criteria are stated in the alternative, therefore, only one need exist to support the imposition of consecutive sentencing. *See id.*; *State v. Denise Dianne Brannigan*, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *19 (Tenn. Crim. App., at Knoxville, June 13, 2012), *no Tenn. R. App. P. 11 application filed*. The imposition of consecutive sentencing, however, is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" T.C.A. § 40-35-103(2), (4). In addition to these criteria, "consecutive sentencing is guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed,'" although specific factual findings are not necessary. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002); *see also* T.C.A. §§ 40-35-102(1), -103(2); *In re Sneed*, 302 S.W.3d 825, 828-29 (Tenn. 2010). We review a trial court's decision to impose consecutive sentences for an abuse of discretion, accompanied by a presumption of reasonableness. *State v. James Allen Pollard*, 432 S.W.3d 851 (Tenn. 2013).

Our Supreme Court has held that "the imposition of consecutive sentences on an offender found to be a dangerous offender requires, in addition to the application of general principles of sentencing, the finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939. While we agree with the Defendant that the trial court failed to make the requisite findings in consideration of the dangerous offender factor, factor (4), we reiterate that only one consecutive sentencing factor needs to exist to support the imposition of consecutive sentences. Mr. Tinsley's testimony at the sentencing hearing that the Defendant was on probation on March 28, 2014, supports the trial court's conclusion that the Defendant was on probation when he committed this offense, which supports the trial court's application of consecutive sentencing factor (6). The trial court considered the relevant principles and sentenced the Defendant to a within range sentence. Based on the evidence at trial, the sentence imposed on the Defendant was not excessive, and the trial court did not abuse its discretion. Accordingly, we conclude that the Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE